MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 116
Docket:        Aro-17-539
Argued:        November 7, 2018
Decided:       July 23, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:      SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:   ALEXANDER, J.

STATE OF MAINE

v.

REGINALD J. DOBBINS JR.

HJELM, J.

[¶1]  On an evening in March of 2015, a sixty-one-year-old man was bludgeoned and stabbed to death in his Houlton residence.  Reginald J. Dobbins Jr. was charged with murder, found guilty by a jury, and sentenced by the court (Aroostook County, *Stewart, J.*) to sixty-five years in prison.  Dobbins appeals the resulting judgment of conviction.  He asserts that the court erred by excluding certain evidence purporting to show that his friend, Samuel Geary, was responsible for the murder, including evidence that Geary had pleaded guilty to murdering the same man.  Dobbins also contends that the sentence is unconstitutional because it "condemns Dobbins to die in prison for a crime that happened when he was just 18 years old."  We conclude that the court erred by

2

excluding evidence of Geary's guilty plea to the murder charge but that the error was harmless due to the magnitude and strength of the evidence that was admitted to demonstrate both Geary's and Dobbins's guilt. We are unpersuaded by the remainder of Dobbins's arguments and affirm the judgment.

## I. BACKGROUND

[¶2] We describe the background of this case based on the evidence seen in the light most favorable to the jury's verdict, *see State v. Davis*, 2018 ME 116, ¶ 2, 191 A.3d 1147, and the procedural record.

[¶3] On March 1, 2015, the victim was killed in his mobile home, which was ransacked. An autopsy revealed that the victim had sustained twenty-one blunt-trauma injuries to his arms, torso, and head, and ten sharp-instrument injuries to his head and back. Most of the victim's head trauma was caused by the face and claw of a hammer that was used to brutally fracture his skull and lacerate his brain. The stab wounds, caused by a knife, penetrated the victim's lungs.

[¶4] Dobbins, who was eighteen years old at the time of the murder, was arrested about a week later and charged with intentional or knowing murder, *see* 17-A M.R.S. § 201(1)(A) (2018). He was indicted for that charge in May of

2015 and pleaded not guilty. Samuel Geary was sixteen years old at the time of the murder and was charged with murder in Juvenile Court[1] but was later bound over to be tried as an adult, *see* 15 M.R.S. § 3101(4) (2018). In May of 2016, the State filed a notice of joinder of the charges pending against Dobbins and Geary. *See* M.R.U. Crim. P. 8(b). Dobbins opposed joinder in part on the ground that, because Dobbins and Geary each contended that the other was responsible for the murder, their theories of the case were too antagonistic to allow for a fair trial if their cases were joined. The court ordered that the cases be joined for trial, but in May of 2017 Geary pleaded guilty to the murder charge. His sentencing hearing was continued until after Dobbins's trial was to be held.

[¶5] The court held an eight-day jury trial in Dobbins's case in June of 2017. The State's theory of the case was not specific as to whether Dobbins was the principal or an accomplice to Geary. Dobbins's defense was that Geary murdered the victim "while Dobbins stood by in shock." During the trial, the State wanted to call Geary as a witness, but Geary's attorney informed the court that Geary would invoke his Fifth Amendment privilege against self-incrimination and refuse to testify. Dobbins argued that for Geary to be

---

[1] The District Court, when exercising its jurisdiction pursuant to the Maine Juvenile Code, is referred to as the Juvenile Court. *See* 15 M.R.S. § 3003(15) (2018).

4

able to assert the privilege, the State was required to call him as a witness. The court denied Dobbins's request but held a hearing outside the presence of the jury where, after Geary was placed under oath, he invoked his Fifth Amendment privilege. The court dismissed Geary as a witness, and he did not testify before the jury.

[¶6] Dobbins offered in evidence words that Geary had carved into the surface of a wooden shelf in his room where he was being held pretrial at the Mountain View Youth Development Center.[2] The statement said: "Every one has a story, whats urs?" Below that was, "1) Murder." Dobbins offered this as a statement made by Geary against interest pursuant to Maine Rule of Evidence 804(b)(3). Additionally, Dobbins sought to admit a certified copy of a court docket entry documenting Geary's guilty plea to the murder charge. The State objected to the admission of both forms of evidence. Outside the presence of the jury, the parties conducted voir dire of the Mountain View staff member who had discovered a number of Geary's carved statements, including the one quoted above. After the parties were heard on the admissibility of the evidence offered by Dobbins, the court excluded evidence of both the carving and the guilty plea, concluding that none of that evidence constituted an admissible

---

[2] The State conceded that the carving was Geary's.

statement against interest. Regarding the evidence of Geary's guilty plea, the court also concluded that the risk of unfair prejudice to the State would not be sufficiently ameliorated by a limiting instruction, which Dobbins proposed, advising the jury that evidence of the plea did not have the effect of exonerating Dobbins.

[¶7]  After the close of the evidence, the court instructed the jury that it could consider Dobbins's guilt as either a principal or an accomplice to murder. After deliberations, the jury found Dobbins guilty. At a hearing held in October of 2017, the court sentenced Dobbins to a prison term of sixty-five years. Dobbins applied for leave to appeal his sentence, which was denied by the Sentence Review Panel. *See* 15 M.R.S. §§ 2151, 2152 (2018); M.R. App. P. 20. Dobbins also filed a timely appeal from the judgment. 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

[¶8]  On appeal, Dobbins raises two categories of challenges. He first argues that the trial court erred by concluding that neither the evidence of Geary's carving nor the court record of Geary's guilty plea was admissible pursuant to Rule 804(b)(3) and that the exclusion of that evidence deprived

6

him of a constitutionally sufficient opportunity to present a defense.[3] He also

asserts that the sixty-five-year prison sentence violates the Eighth Amendment

to the United States Constitution and Article I, section 9 of the Maine

Constitution. We address these issues in turn.

A.    Evidentiary Challenges

[¶9]   Dobbins contends that the court "mechanistically applied" the

Maine Rules of Evidence so as to deny him the opportunity to present a

complete defense in violation of his constitutional rights under the Sixth and

Fourteenth Amendments.[4]

[¶10]  The core of Dobbins's arguments relates to evidentiary principles

governing the admissibility of hearsay evidence. We review a trial court's

decision to admit or exclude hearsay evidence for an abuse of discretion, *State

v. Watson*, 2016 ME 176, ¶ 10, 152 A.3d 152, and we review an alleged

---

[3] In a related challenge, Dobbins asserts that the court erred by allowing Geary to assert his privilege against self-incrimination outside the jury's presence. This contention is not persuasive, and we do not address it further. *See* M.R. Evid. 512(b) ("In criminal jury trials, proceedings shall be conducted, to the extent practicable, so as to allow privilege claims to be made outside of the hearing of the jury."); *State v. Norwood*, 2014 ME 97, ¶ 11, 97 A.3d 613.

[4] Although Dobbins's characterization of the court's rulings as a "mechanistic application" of the Maine Rules of Evidence—a phrase borrowed from case law, *see Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)—may be seen to suggest that the rulings were correct as gauged by the standards in the rules, we understand him to assert that the rulings were erroneous pursuant to both the rules and constitutional principles.

constitutional violation de novo, *State v. Hassan*, 2018 ME 22, ¶ 11, 179 A.3d 898.

1. Evidence of Geary's Carving

[¶11] Geary's words were found carved into a wooden shelf in his room at Mountain View and stated, "Every one has a story, whats urs? 1) Murder." That statement was near others, also made by Geary, which said things such as "do or die," "no salvation," and "talk shit, get hit." Dobbins contends that the court erroneously concluded that the statement that included the reference to murder is not admissible hearsay pursuant to Maine Rule of Evidence 804(b)(3) and that this error contributed to a violation of his constitutional right to present a defense.

[¶12] Dobbins offered the statement as Geary's admission that he was involved in committing the murder. *See* M.R. Evid. 801. Because the statement was offered to prove its truth, it was admissible at trial only if, among other things, it fell within an exception to the general rule that bars the admission of hearsay evidence. *See* M.R. Evid. 802. The exception at issue here is Rule 804(b)(3).

[¶13] Subject to a limitation not applicable here, Rule 804(b)(3) creates an exception to the general prohibition against the admission of hearsay for a

8

statement that is against the declarant's interest. In the context of this case, the foundation for the admissibility of hearsay pursuant to Rule 804(b)(3) comprises three elements: (1) the declarant is "unavailable" to testify within the meaning of Rule 804(a); (2) the statement is contrary to the declarant's interests to a degree that a reasonable person would not have made the statement unless he believed it to be true; and (3) there exist clear indications demonstrating the statement's trustworthiness.[5] M.R. Evid. 804(b)(3). We have stated that the last of these factors implicates

the following four additional factors:

1. the time of the declaration and the party to whom it was made;

2. the existence of corroborating evidence in the case;

3. whether the declaration is inherently inconsistent with the accused's guilt; and

4. whether at the time of the incriminating statement the declarant had any probable motive to falsify.

*State v. Small*, 2003 ME 107, ¶ 25, 830 A.2d 423 (citing *State v. Cochran*, 2000 ME 78, ¶ 12, 749 A.2d 1274).

---

[5] This third factor becomes a foundational element for the admission of a statement against interest only in a criminal proceeding where—as here—the out-of-court statement "tends to expose the declarant to criminal liability." M.R. Evid. 804(b)(3)(B).

[¶14]  Here, there is no dispute that Geary was unavailable as a witness because he legitimately invoked his privilege against self-incrimination.  *See* M.R. Evid. 804(a)(1).  The question is whether the evidence of Geary's carving meets the other two elements of a statement against interest.  In excluding the evidence, the court concluded that the meaning and purpose of the statement were unexplained and unknown.  In other words, the content of Geary's statement is enigmatic to the point that it does not carry meaningful indicia that he intended the statement to be against his interest.  The court legitimately hypothesized that, if the statement had anything to do with this murder in the first place, the statement could well have been an accusation by Geary that someone else—Dobbins, for example—committed it.  The court further concluded that the additional carved statements, such as "do or die," "no salvation," and "talk shit, get hit," contributed to the uncertainty about what Geary meant by the "murder" reference.

[¶15]  Additionally, the court found that there remained a material question of whether Geary had an incentive to be truthful when he made the statement because the reasons why he created the statement were undeveloped in the record.  As the court noted, because it is not clear what

Geary was trying to express, it cannot be determined whether the statement was truthful.

[¶16] The court did not abuse its discretion as gatekeeper by concluding that, given the ambiguities and unanswered questions surrounding the statement, Geary's carved words did not have the "persuasive assurances of trustworthiness" necessary to bring it "well within the basic rationale" of the hearsay exception. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Further, the exclusion of the evidence did not deprive Dobbins of his constitutional right to present a meaningful defense. *See id.*; *see also State v. Burbank*, 2019 ME 37, ¶ 22, 204 A.3d 851 ("State rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials so long as those rules are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" (alterations and quotation marks omitted)).

2. Evidence of Geary's Guilty Plea

[¶17] Dobbins next contends that the court erred by excluding from evidence the docket entry in Geary's case showing that Geary had entered a guilty plea to the murder charge. Dobbins argues both that the court erred by not analyzing the admissibility of the guilty plea under the public record

exception to the hearsay rule, M.R. Evid. 803(8),[6] and that its exclusion contributed to the deprivation of Dobbins's constitutional rights. Dobbins is correct that the court abused its discretion by excluding the docket entry showing Geary's guilty plea, but, given the substantial body of evidence of both Dobbins's and Geary's criminal involvement in the murder that *was* presented to the jury, the court's error was harmless.

[¶18] The docket entry of Geary's guilty plea to the murder charge contains two layers of hearsay: first, it represents an out-of-court statement by Geary—his guilty plea itself; and, second, it is an out-of-court written statement by a court employee that Geary had entered that plea. *See* M.R. Evid. 801(c). When a statement contains multiple layers of hearsay, each layer must be analyzed individually and determined to be admissible for the underlying hearsay statement ultimately to be admissible. *See* M.R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). Consequently, Dobbins was required to demonstrate that Geary's guilty plea and the written

---

[6] At trial, Dobbins asserted that the docket record reflecting Geary's guilty plea should be admitted as a statement against interest under M.R. Evid. 804(b)(3), but the court concluded otherwise. Although Dobbins's primary argument on appeal is that the court erred by failing to apply the Rule 803(8) framework, his argument also implicates Rule 804, which we therefore address.

docket record memorializing that plea each fell within an exception to the rule barring the admission of hearsay evidence.

a.    Rule 804(b)(3)

[¶19]  The application of Rule 804(b)(3) determines whether the first layer of hearsay—Geary's guilty plea—is admissible.  Without controversy, the court properly determined that Geary was unavailable and that a guilty plea to a murder charge is a statement against penal interest.  The remaining question is whether evidence of the plea meets the third element created by the Rule— that the circumstances surrounding the entry of the plea clearly indicate that the admission of guilt was trustworthy.

[¶20]  In analyzing that foundational element, the court appropriately considered the four subfactors articulated in *Cochran*, discussed above.  *See* 2000 ME 78, ¶ 12, 749 A.2d 1274.  The court properly concluded that the evidence satisfied three of those trustworthiness factors: (1) that an indicium of trustworthiness arises from Geary's declaration of his guilt to a judge—in fact, the same jurist who was presiding at Dobbins's trial—during a court proceeding held a month prior to Dobbins's trial; (2) that there was corroborating testimonial and forensic evidence of Geary's guilt, the factual basis for which the court confirmed at the plea hearing, *see* M.R.U.

Crim. P. 11(b)(3) (as applicable here, requiring the court to ensure that there is a "factual basis" for a charge to which a defendant pleads guilty); and (3) that nothing in the record suggested that Geary had a motive to lie by pleading guilty. The trustworthiness of Geary's statement against penal interest is materially enhanced because it took the form of a guilty plea to the most serious criminal offense created by State law, *see* 17-A M.R.S. §§ 1251, 1252 (2018) (providing that the minimum sentence for murder is 25 years and that only a murder charge may result in a sentence of life imprisonment), and was presented in a proceeding where Geary's interests were surrounded by a full panoply of procedural protections, *see* M.R.U. Crim. P. 11; *see also, e.g.*, *Laferriere v. State*, 1997 ME 169, ¶ 12, 697 A.2d 1301 ("Unlike at a trial, the defendant who enters a plea of guilty in a Rule 11 proceeding is cooperating in the creation of a record intended to instill confidence that the outcome is a reliable reflection of guilt."); *United States v. Winley*, 638 F.2d 560, 562 (2d Cir. 1981) (affirming the determination that a guilty plea was reliable under Fed. R. Evid. 804(b)(3)).

[¶21] Despite concluding that these factors supported the admissibility of evidence of Geary's guilty plea, however, the court excluded that evidence based on the remaining trustworthiness factor found in *Cochran*, namely,

14

whether the out-of-court declaration is "inherently inconsistent" with the guilt of the accused—here, Dobbins. The court concluded that Geary's guilty plea was not inherently inconsistent with Dobbins's guilt because the State's evidence did not cast Geary as *solely* culpable for the murder and because it could not be determined whether Geary, when entering the plea, was taking sole responsibility for the murder or, alternatively, was admitting that he had acted in concert with Dobbins either as a principal or an accomplice.

[¶22] The requirement that the proponent demonstrate circumstances clearly indicating the trustworthiness of the statement against penal interest, when offered in a criminal proceeding, was added to Rule 804(b)(3) in 1976. M.R. Evid. 804 Advisory Committee's Note to 2011 amend. Previously, we had expressed concern that if every admission of guilt to a crime by a nonparty were admissible as a statement against interest, the administration of justice would be "seriously handicap[ped]" because the door would be opened for "defendants to produce perjured and fraudulent 'confessions' by others who, for some reason or other, have absconded or are otherwise unavailable as witnesses." *State v. Gervais*, 317 A.2d 796, 802-03 (Me. 1974).[7] The

---

[7] A leading commentator has also pointed to the "well-known phenomenon of numerous patently false confessions" made by people who had nothing to do with the crimes to which they confessed, as a separate justification for imposing a requirement that the proponent of the out-of-court

requirement set out in Rule 804(3)(b), requiring, as a foundational matter, a showing that the nonparty's confession is trustworthy, ameliorates this concern. *See State v. Smith*, 415 A.2d 553, 559 (Me. 1980) (discussing Rule 804(b)(3) in its present formulation); *Gervais*, 317 A.2d at 802 (noting, prior to the rule change, that most jurisdictions that had adopted a rule allowing the admission of statements against penal interests attached "certain specific safeguards" to protect the State's legitimate interests while also providing "essential justice and common fairness" to the defendant seeking to present the evidence).

[¶23]  Here, the court conflated the question of whether Geary's guilty plea was trustworthy with the question of whether, in addition to being inculpatory for Geary, it was exculpatory of Dobbins.  The latter issue is one of relevance and probative value, which must be addressed—as we do below—in the context of Maine Rules of Evidence 402 and 403.  The predicate question of the trustworthiness of Geary's guilty plea, on the other hand, *assumes* that that evidence is relevant by having an exculpatory effect as to the accused.  The proper inquiry is whether the inculpatory declaration was made under circumstances that make any exculpatory effect as to the accused less than

---

statement demonstrate surrounding circumstances of trustworthiness.  Field & Murray, *Maine Evidence* § 804.4 at 520 (6th ed. 2007).

clearly trustworthy. *See Smith*, 415 A.2d at 561 (stating that "the circumstances indicating trustworthiness must clearly corroborate the exculpatory, as well as the inculpatory, nature of the statement . . . to assure the reliability of the declaration's exculpation of the accused, the ultimate issue on which the evidence is offered" (emphasis omitted)). This provides some assurance that the admission is reliable and diminishes the prospect of presenting a fact-finder with a nonparty's fraudulent or otherwise false confession to a crime, which was made for the purpose of deflecting guilt away from the accused.

[¶24] In the court's Rule 804(b)(3) analysis, all of the factors it articulated demonstrated that Geary's admission of guilt embodied in his guilty plea was trustworthy, and the court did not identify *any* factor that would raise a suspicion about the trustworthiness of any exculpatory effect Geary's plea would have as to Dobbins. On this record, in other words, it cannot be said that by pleading guilty, Geary was fabricating his own guilt and attempting to "shift culpability" away from Dobbins. *See State v. Small*, 2003 ME 107, ¶ 27, 830 A.2d 423. Although the court appropriately raised the question of whether, given the particular circumstances of this case, Geary's guilty plea could be seen as an exoneration of Dobbins, that concern would not suffice as a basis to exclude the evidence pursuant to Rule 804(b)(3), because the fact remains that

Geary's plea was a statement against penal interest that necessarily met each of the foundational elements prescribed by that rule. Therefore, the court's invocation of Rule 804(b)(3) as the basis to exclude evidence of the guilty plea was erroneous.

       b.     Rule 803(8)

[¶25] Dobbins next challenges the court's determination that the public record exception was not the "appropriate framework" for analyzing the admissibility of Geary's guilty plea. This implicates the second layer of hearsay, namely, the docket entry memorializing Geary's guilty plea.

[¶26] The court erred by not considering the admissibility of Geary's guilty plea pursuant, in part, to the public record exception to the hearsay rule because the docket entry constitutes the second layer of hearsay exceptions that must be met for the court record of Geary's statement against penal interest ultimately to be admissible. Nonetheless, the record establishes that the docket entry was within the public records exception to the hearsay rule.

[¶27] As we have held, the admissibility of certified docket entries draws on the public records exception to the hearsay rule found in Maine Rule of Evidence 803(8). *See State v. Troy*, 2014 ME 9, ¶ 16 n.7, 86 A.3d 591. Pursuant to that rule, "[a] record or statement of a public office" is not subject to

exclusion, despite its hearsay character, if the record "sets out . . . [t]he office's regularly conducted and regularly recorded activities," with exceptions not applicable here. M.R. Evid. 803(8)(A)(i). A criminal docket record documenting Geary's guilty plea clearly satisfies the rule's requirements. A clerk's office, where docket records of court events are created and maintained, is a "public office," and the docket record reflects the activity—the entry of a guilty plea, for example—of that public office's regularly conducted judicial business. *See* M.R. Evid. 803(8)(A)(i); *see also, e.g.*, *United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) ("[C]ertified court records are public records, thereby falling within the public records exception to the hearsay rule"); *United States v. Gotti*, 641 F. Supp. 283, 290 (E.D.N.Y. 1986) (holding that the record of third party's guilty plea was admissible as a public record). Consequently, evidence of Geary's guilty plea is not barred by the rules prohibiting the admission of hearsay evidence.

[¶28] As the final step in the evidentiary analysis, we now consider the effect of Rule 403.

### c. Rule 403

[¶29] Although much of the court's explanation of its reasoning for excluding evidence of Geary's guilty plea focused on Rule 804(b)(3), the court

also touched on Rule 403 and its principles and concluded that the evidence at issue was inadmissible pursuant to that authority. In doing so, the court acknowledged Dobbins's theory of the case that Geary was solely responsible for the murder. The court reasoned, however, that allowing evidence of Geary's plea "in a vacuum" would invite the jury to speculate why Geary pleaded guilty. The court also stated that evidence of the guilty plea is not necessarily exculpatory as to Dobbins because one defendant could be an accomplice to the other and that—specific to Rule 403—the presentation of evidence that Geary had pleaded guilty would mislead or confuse the jury in Dobbins's trial.

[¶30]  Pursuant to Rule 403, a court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *State v. Maderios*, 2016 ME 155, ¶ 10, 149 A.3d 1145 (quotation marks omitted). Although "[t]he trial court is afforded wide discretion to make Rule 403 determinations," *id.* (quotation marks omitted), the court's exclusion of the evidence here exceeded the bounds of that discretion.

[¶31]  At trial, the extent of Geary's participation in the murder was a material issue and constituted the core of Dobbins's defense. As we discuss below, both the State and Dobbins presented the jury with considerable

testimonial and forensic evidence of Geary's guilt. Although evidence that Geary had pleaded guilty to murder is not necessarily inconsistent with Dobbins's own guilt, the evidence of Geary's plea is not devoid of probative value. *See* M.R. Evid. 401 (stating that "[e]vidence is relevant if . . . [i]t has *any tendency* to make a fact more or less probable than it would be without the evidence; and . . . [t]he fact is of consequence in determining the action" (emphasis added)).

[¶32] Then, the court must determine whether the danger of unfair prejudice to a party *substantially* outweighs the probative value of the evidence at issue. M.R. Evid. 403. Here, for two reasons, the risk of any prejudice unfair to the State, as the party opposing introduction of the evidence, was—at most—remote.

[¶33] First, the State's assertion that evidence of Geary's guilty plea would be unfairly prejudicial to its interests is belied by several aspects of its own approach to the case against Dobbins. Before Geary pleaded guilty, the State sought to join the cases against him and Dobbins so that there would be a single, consolidated trial where the State would present evidence of both defendants' guilt. The court denied Dobbins's motion for relief from prejudicial joinder, indicating that the court was satisfied that the guilt of one defendant as

established at a consolidated trial would not interfere with the jury's ability to make a proper determination of whether the State also proved the other defendant's guilt.

[¶34]  Only Dobbins actually proceeded to trial, but during that trial the State's case included significant evidence connecting Geary to the murder.  The State's pretrial willingness to present evidence of Geary's guilt simultaneously with its effort to prove Dobbins's guilt, and the body of evidence the State itself presented at Dobbins's trial demonstrating Geary's culpability, show that, even in the State's view, the presentation of evidence of Geary's guilt—whatever form that evidence might take—cannot be properly regarded as an unfair impediment to the State's case against Dobbins.

[¶35]   Second, any concern that the jury might attach improper significance to evidence of Geary's plea would have been alleviated by the limiting instruction that Dobbins himself proposed to the court—that the plea does not have the effect of exonerating Dobbins.  Indeed, in its instructions to the jury about the ways *Dobbins* could be found guilty, the court instructed the jury on the law of accomplice liability to make clear that more than one person can be guilty of a single crime.[8]  *See* 17-A M.R.S. § 57(3)(A) (2018); *State v. Hurd*,

---

[8] When the parties presented their arguments on the admissibility of evidence of Geary's guilty plea, the State took the position that the evidence would have to be considered in the context of

2010 ME 118, ¶ 29, 8 A.3d 651.  In excluding evidence of Geary's guilty plea, however, the court concluded that—as to *Geary*—the same type of instruction would not adequately inform the jury that the plea still allowed for Dobbins to be found guilty.

[¶36]  The concurring opinion asserts that Dobbins intended to use evidence of Geary's guilty plea to demonstrate, *by itself*, that Dobbins could not be found guilty of the murder.  *See* Concurring Opinion at ¶¶ 66-67.  That assertion, however, is belied by Dobbins's explicit statement to the court that he did not intend to argue to the jury that Geary's guilty plea alone meant that Dobbins could not be found guilty.  The concurrence's analysis is further compromised by Dobbins's own request that evidence of Geary's plea be accompanied by a limiting instruction to the jury that the plea does not exonerate Dobbins.  Jurors are presumed to follow the court's instructions, *see State v. Dolloff*, 2012 ME 130, ¶ 55, 58 A.3d 1032, and the limiting instruction that Dobbins proposed would have eliminated any prospect that the State

Geary's entire plea hearing—an argument that, in effect, invoked the rule of completeness, *see* M.R. Evid. 106.  Neither party submitted a transcript of the plea hearing, however, and the record does not contain any meaningful description of what that additional evidence might be.  Consequently, on this record, we cannot know whether the basis for Geary's guilty plea was as the only guilty person, or as a principal with Dobbins as the accomplice, or as an accomplice with Dobbins as the principal.  This record therefore does not present an occasion for us to consider whether, notwithstanding Dobbins's constitutional right of confrontation, the court-promulgated rule of completeness would entitle the State to present any such evidence.

would be unfairly prejudiced by the admission of evidence that Geary had pleaded guilty, just as with the substantial evidence of Geary's guilt that *was* admitted during the trial—evidence that the State characterizes on appeal as "abundant." There is no reason why additional evidence of Geary's guilt in the form of the docket entry of his guilty plea would have resulted in any unfair prejudice to the State if other evidence of his guilt did not have that effect.

[¶37] For these reasons,[9] the court abused its discretion by excluding evidence of Geary's guilty plea based on its application of Rule 403.[10] *See, e.g.*, *State v. Thurlow*, 1998 ME 139, ¶ 6, 712 A.2d 518.

### d. Harmless Error

[¶38] Having determined that the court erred by excluding evidence of Geary's guilty plea, we must next consider the effect of that error and, more particularly, whether it was harmless as gauged by its effect on Dobbins's

---

[9] Given our conclusion that the court erred in excluding the evidence pursuant to the Rules of Evidence, we do not reach Dobbins's alternative argument that the court's evidentiary ruling was unconstitutional.

[10] We note that in different contexts, "[r]esolution of cases involving co-defendants and consequences that may have occurred to co-defendants should not be considered by the jury, whether or not the co-defendants were originally joined for trial." Alexander, *Maine Jury Instruction Manual* § 4-9 cmt. (2017-2018 ed.). Cases that preclude admission of evidence of guilty pleas or findings adverse to co-defendants in criminal trials focus on avoiding a presumption of guilt arising from a co-defendant's admission—in effect, guilt by association. *See, e.g.*, *United States v. Ofray-Campos*, 534 F.3d 1, 18-24 (1st Cir. 2008). Here, it was Dobbins, and not the State, who offered evidence of Geary's guilty plea. The general reasoning for excluding this type of evidence is therefore inapposite here.

"substantial rights," M.R.U. Crim. P. 52(a); *see* M.R. Evid. 103(a). Error is harmless if it was not "sufficiently prejudicial to have affected the outcome of the proceeding." *Dolloff*, 2012 ME 130, ¶ 33, 58 A.3d 1032 (quotation marks omitted); *see also State v. Larsen*, 2013 ME 38, ¶ 23, 65 A.3d 1203 ("A constitutional error made at trial may be deemed harmless if we are satisfied beyond a reasonable doubt, based on the trial record as a whole, that the error did not contribute to the verdict obtained." (quotation marks omitted)); *State v. Patton*, 2012 ME 101, ¶ 17, 50 A.3d 544.

[¶39] Here, the State's evidence of Dobbins's guilt is so substantial that, even if the record had been supplemented by evidence of Geary's plea, the same result would have obtained. Further, the record, viewed in its totality, already contains evidence of Geary's own significant involvement in the murder to an extent that the exclusion of evidence of his guilty plea itself would not have changed the verdict. We briefly review the considerable evidence presented to the jury showing both Dobbins's and Geary's involvement in the murder.

i. Evidence of Dobbins's Guilt

[¶40] Dobbins's guilt was proved to the jury with physical and forensic evidence and with testimony. Two murder weapons were found in Dobbins's residence. Investigators recovered one of the murder weapons—a folding knife

with blood containing the victim's DNA—hidden in a wall in Dobbins's bedroom. Dobbins later told investigators that the knife was his. Investigators recovered the second murder weapon—a hammer—from a kitchen drawer in Dobbins's home. Additionally, the victim's blood was found on one of Dobbins's sneakers. And on a glove recovered near where the victim's truck was located, forensic examiners found the victim's DNA in a bloodstain and Dobbins's DNA inside the glove.

[¶41] As to the testimonial evidence, during the investigation, detectives interviewed Dobbins three times, and each time Dobbins gave fundamentally contradictory accounts of his actions surrounding the murder. Dobbins was first interviewed just before investigators searched Dobbins's home pursuant to a warrant and recovered physical evidence implicating him in the murder. During that interview, Dobbins told investigators that on the night of the murder he had been with Geary and that the two walked past the victim's residence to meet someone who lived near the victim for purposes of a drug-related transaction. Dobbins further stated that while walking past the victim's home, he heard men's voices nearby, but he then changed his story to state that he was confused and that the voice was Geary's mother's on a cell phone. He also said that he and Geary were given a ride back into town by the

girlfriend of the individual they went to meet, which contradicts the testimony of his own father, who stated that it was he who drove Dobbins and Geary back. Dobbins stated that he was wearing a yellow jacket and that Geary was wearing a "hoodie." But while investigators were conducting the search at Dobbins's home, his mother told the officers that Dobbins actually had been wearing the black coat that police seized, on which blood from both the victim and Geary was later found. Dobbins denied to police that he had been wearing the black coat, but at that point in the interview he began to sweat and went to the bathroom to vomit.

[¶42] Not long after investigators completed the search of Dobbins's residence, Dobbins contacted one of the detectives and said he needed to talk. During the resulting second interview, Dobbins admitted that he had been at the victim's home but claimed that he stood outside while Geary went inside, beat the victim with an object, and then demanded that Dobbins enter the home, where he claimed to have witnessed Geary repeatedly stab the victim. Dobbins further said that it was Geary who was wearing the blood-stained black coat, changing his previous account that Geary had worn a hoodie.

[¶43] During the third interview, Dobbins continued to blame Geary for the murder, but he changed his statement about the black coat by admitting

that *he* had worn it—but not until after the murder—stating that Geary had demanded to wear it as a "blood shield" immediately before entering the victim's home and gave it back to Dobbins after committing the murder. After his arrest, Dobbins admitted that he lied to police in some statements he had made during the first interview, and he admitted that he had driven the victim's truck after the murder and that the knife with the victim's DNA belonged to him, not to Geary as he had previously claimed.

[¶44]   In addition to Dobbins's evolving statements, the jury was presented with a video showing him purchasing a video game at a local store a day or so after the murder, at a time when he claimed to police he had been at home and in distress because of his reported shock at having watched Geary kill the victim.

[¶45]   The jury also heard testimony from Dobbins's cellmate, who testified that Dobbins had confessed his involvement in the murder. The cellmate testified that Dobbins at first blamed Geary but then said that both he and Geary, after getting drunk, went to the victim's home to rob him of drugs, that they brought the knife and the hammer, that they attacked the victim repeatedly with the hammer, and that Geary then stabbed the victim repeatedly with a knife. The cellmate's testimony about Dobbins's description of the

victim's injuries was consistent with the findings of the pathologist who conducted the post-mortem examination, of which the witness had no knowledge.

ii.     Evidence of Geary's Participation in the Murder

[¶46]  As to Geary, on this record, *see supra* n.8, and as we discuss below, his guilty plea by itself can signify nothing more than his involvement in the murder as an accomplice.  Even without evidence of that plea, his substantial participation in the murder is established by a considerable amount of physical and forensic evidence.  At the murder scene, Geary's DNA was found in blood on a chair next to the victim's body and in blood inside the victim's pants pocket.  Blood with Geary's DNA was also found in numerous places inside the passenger compartment of the victim's truck, which was found off the side the road on the night of the murder.  Some of Geary's DNA in the truck was mixed with the DNA from the victim's blood.

[¶47]  When investigators searched Dobbins's residence, they recovered, among other items, the claw hammer—one of the murder weapons.  The victim's DNA was found in blood on the claw, and Geary's DNA was on the handle.[11]  On the black coat noted above, forensic analysts found bloodstains

---

[11]  Although Dobbins asserts that Geary's DNA was found on the knife recovered from Dobbins's bedroom wall, the only DNA on the knife was from the victim.  While conducting a search of Geary's

containing DNA that matched both the victim and Geary, as well as Dobbins's DNA. Police also seized a pair of driving gloves from Dobbins's residence. A finger on one of the gloves had a slice, and both Dobbins's and Geary's DNA were found in bloodstains on the gloves.

[¶48] Geary's involvement in the murder was also demonstrated through testimonial evidence. Dobbins himself told officers that he was with Geary at the victim's residence during the murder and that Geary had stabbed the victim. Independent of Dobbins's statements, several witnesses observed two men that evening generally matching Geary's and Dobbins's descriptions walking on the road where the victim lived, heading away from the victim's residence. Dobbins's father confirmed that he had picked up the two men that night.[12]

[¶49] Evidence of Geary's guilty plea would have demonstrated that Geary admitted his guilt but—to the extent revealed by this record, *see supra* n.8—without framing his guilt as that of a lone actor. Accordingly, although

---

person and residence, however, investigators observed a recent cut on Geary's hand. Geary also had scratch marks on his right shoulder, and bruising and red marks on his hands, elbows, and wrists.

[12] The record reveals that there was additional evidence of Geary's involvement in the murder that Dobbins had intended to present at trial but, for reasons not explained in the record, ultimately chose not to. That evidence consisted of testimony from two witnesses, who testified during Geary's bind-over hearing, *see* 15 M.R.S. § 3101(4)(A) (2018), that "Geary admitted responsibility for the murder."

Dobbins sought to use evidence of Geary's plea to support the notion that Geary was solely responsible for the murder, evidence of the plea could not have proven that point. Rather, that evidence could have demonstrated only that he admitted that he was either a principal or an accomplice, without specifying which. *See* 17-A M.R.S. § 57(3)(A). Accomplice liability attaches to a person who is present at the scene of a crime "upon the State's proof of any conduct promoting or facilitating, *however slightly*, the commission of the crime." *State v. Pheng*, 2002 ME 40, ¶ 9, 791 A.2d 925 (emphasis added). Given the undisputed evidence of Geary's presence at the murder scene and the significant blood evidence demonstrating his physical participation in the murder, evidence of Geary's plea would have added little because, on the existing record, it is not reasonable to conclude that the jury found that Geary had nothing to do with the murder. Therefore, the additional evidence—not presented to the jury—that Geary had pleaded guilty to the charge would have been little more than cumulative and, beyond a reasonable doubt, would not have changed the outcome of Dobbins's trial.

[¶50] Given the magnitude of the evidence presented to the jury during the eight-day trial demonstrating both Geary's and Dobbins's guilt, the exclusion of evidence of Geary's plea could not have affected the jury's verdict.

*See Patton*, 2012 ME 101, ¶ 18, 50 A.3d 544. The erroneous evidentiary ruling was therefore harmless.

B.    Challenge to the Sentence

[¶51]    Dobbins next contends that the sixty-five-year prison term imposed by the court is unconstitutionally excessive. The Sentence Review Panel denied Dobbins's application for a discretionary sentence review, leaving Dobbins with a direct appeal from a sentence, which confines the appellate challenge to "a claim that the sentence is illegal, imposed in an illegal manner, or beyond the jurisdiction of the court, and the illegality appears plainly in the record." *State v. Bennett*, 2015 ME 46, ¶ 11, 114 A.3d 994 (quotation marks omitted). On a direct appeal such as this, we review only the legality, and not the propriety, of the sentence,[13] and we do so de novo. *Id.* ¶ 14.

[¶52] The Eighth Amendment to the United States Constitution forbids the imposition of cruel and unusual punishment. U.S. Const. amend. VIII.

---

[13] As part of his constitutional challenge, Dobbins asserts that the psychological treatment he received, his diagnosed learning disability, his family history, and his history of substance abuse are mitigating factors that the court did not adequately consider. A court's factual findings or discretionary determinations in sentencing are cognizable only on a discretionary appeal, *State v. Plante*, 2018 ME 61, ¶ 5, 184 A.3d 873, and therefore we do not consider such challenges on direct appeal. *See State v. Ward*, 2011 ME 74, ¶ 15, 21 A.3d 1033 ("[N]either the general propriety of the sentence[] imposed by the Superior Court, nor [defendant]'s lack of a serious criminal record or other individual factors, have any significance in determining whether his punishment is unconstitutional."); *see also State v. Gilman,* 2010 ME 35, ¶ 21, 993 A.2d 14 (holding that article I, section 9 of the Maine Constitution "does not require consideration of the individual circumstances of each offender").

Further, article I, section 9 of the Maine Constitution provides that "all penalties and punishments shall be proportioned to the offense." Me. Const. art. I, § 9. To assess whether a sentence violates the Maine Constitution, we first "look to see whether a particular sentence is greatly disproportionate to the offense for which it is imposed," and second, "if it is not greatly disproportionate, we examine whether it offends prevailing notions of decency." *State v. Lopez*, 2018 ME 59, ¶ 15, 184 A.3d 880 (quotation marks omitted). If a sentence fails either part of the test, it is unconstitutional. *Id.* "In applying this test, we are mindful that only the most extreme punishment decided upon by the Legislature as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to be unconstitutionally disproportionate, or cruel and unusual." *Id.* (quotation marks omitted).

[¶53] Dobbins asserts that "youth is the ultimate mitigating factor" and that Maine courts "should not be authorized to impose life sentences or de facto life sentences on young people with no meaningful hope for rehabilitation or release."

[¶54] Dobbins's argument ultimately fails because it is built on two incorrect predicates, one factual and the other legal.

[¶55]  For the first incorrect analytical element, the sixty-five-year sentence imposed by the court is in fact a term of years, not a life sentence. *See* 17-A M.R.S. § 1251(1) ("A person convicted of the crime of murder must be sentenced to imprisonment for life *or* for any term of years that is not less than 25." (emphasis added)).  Further, because Dobbins was eighteen years old when he was arrested and twenty-one at the time of the sentencing hearing, the sentence cannot be properly viewed even as a de facto life sentence. *See State v. Wood*, 662 A.2d 908, 913 (Me. 1995) (suggesting that "a sentence for a term of years must be viewed objectively in evaluating whether it constitutes a de facto life sentence").

[¶56]  The second flaw in Dobbins's assertion is his misapplication of the legal principles emanating from the case law he cites as authority.  Those cases specifically address mandatory life sentences of juveniles when neither the sentence nor applicable law allows for the possibility of parole.  In *Graham v. Florida*, the Supreme Court of the United States held that the Eighth Amendment's proscription against "cruel and unusual punishments" bars the imposition of a life sentence without parole on a juvenile offender convicted of a non-homicide crime because there is a difference "in a moral sense" between homicide and non-homicide crimes.  560 U.S. 48, 69, 82 (2010).  Two years

later, in *Miller v. Alabama*, the Supreme Court extended *Graham* to homicide prosecutions against juveniles and held that the Eighth Amendment prohibits the mandatory imposition of a sentence of life imprisonment without the possibility of parole. 567 U.S. 460, 489 (2012). In *Miller*, the Court did not foreclose life sentences altogether but instead requires a sentencing authority "to consider mitigating circumstances before imposing the harshest possible penalty for juveniles" and "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480, 489.[14]

[¶57] The opinions in *Graham* and *Miller* are built on two factors that are not present here: offenders who are younger than eighteen at the time of the crime, and the imposition of a life sentence (discretionary in *Graham*, mandatory in *Miller*) without any possibility of parole. Neither circumstance is present here.

---

[14] Dobbins also relies on a third case, a habeas corpus proceeding, *Cruz v. United States*, No. 11-CV-787, 2018 U.S. Dist. LEXIS 52924, at *70 (D. Conn. March 29, 2018), where the court extended the Supreme Court's analysis in *Miller v. Alabama*, 567 U.S. 460 (2012), to set aside a mandatory life sentence without the possibility of parole for an offender who was eighteen years old at the time of his crime. *Cruz*, however, is inapposite because the sentence was for life, and it was mandatory. *Id.* at *5. Moreover, the court in *Cruz* explicitly stated that its ruling "does not foreclose a court's ability to sentence an 18-year-old to life imprisonment without parole, but requires the sentencer to take into account how adolescents, including late adolescents, 'are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" 2018 U.S. Dist. LEXIS 52924 at *70 (quoting *Miller*, 567 U.S. at 480). Here, when imposing its sentence on Dobbins, the court explicitly considered those age-related differences.

[¶58]   The lesson emanating from *Miller*—which is the case that addresses the constitutionality of sentences for criminal homicides—is that statutes creating mandatory sentences of life imprisonment for juveniles are unconstitutional because those laws foreclose the court from individualizing the sentence to the juvenile offender.  *See* 567 U.S. 460 at 478, 489.  Even to the extent that *Miller* may properly be applied here—to an offender who was an adult at the time he committed the murder—the principle of individualization was honored because here the court did precisely what *Miller* requires in juvenile proceedings: fashioning the sentence to the unique circumstances of the case as required by 17-A M.R.S. § 1252-C (2018).  That statute requires a court to examine the particular circumstances of the crime to establish the basic sentence, and then, "*in order to individualize each sentence* and set the maximum term, the court next considers aggravating and mitigating factors that will either reduce, enhance, or have no effect on the maximum sentence." *State v. Parker*, 2017 ME 28, ¶ 32, 156 A.3d 118 (emphasis added).

[¶59]   During the sentencing hearing, each party made a plenary presentation to the court focusing on the particular circumstances of the crime, of Dobbins, and of those affected by the victim's death.  In determining the basic term of imprisonment pursuant to the first step of its statutory analysis, the

court carefully considered the factors particular to this case, including the planning that led to the murder, the extreme cruelty of the crime, and Dobbins's pecuniary motivation to commit the murder. The court then explicitly recognized the factors germane to Dobbins's unique circumstances, including his criminal history, education, intellectual level, substance abuse issues, family dynamics, and—important to Dobbins's primary challenge to the sentence— his age. The court also considered Dobbins's post-crime conduct, such as his failure to take responsibility and the untruthful accounts he provided to investigators. The court's consideration of Dobbins's particular circumstances fully comported with the constitutional requirements established by the Supreme Court.

[¶60] Further, given the nature of Dobbins's crime, the sentence imposed by the court is entirely proportionate, even for someone of his age—it is the brutal nature of this crime, and not the sentence, that shocks the conscience. *See* Me. Const. art. I, § 9; *Lopez*, 2018 ME 59, ¶ 15, 184 A.3d 880. The sentence did not violate the federal or Maine constitutions.

## III. CONCLUSION

[¶61] Although the court's exclusion of Geary's guilty plea constituted an abuse of discretion, the error was harmless. Moreover, the sentence imposed

upon Dobbins was not constitutionally flawed. We therefore affirm the judgment.

The entry is:

Judgment affirmed.

---

ALEXANDER, J., concurring.

[¶62] I concur that Reginald J. Dobbins Jr.'s conviction of murder should be affirmed. However, I do not join the Court's opinion because, in my view, the trial court properly excluded the evidence of the docket entry proffered to demonstrate that Samuel Geary had pleaded guilty to the murder.

[¶63] As the Court acknowledges, the record indicates that in opposing the State's motion for joinder a year before the trial, Dobbins asserted that Geary had made statements indicating that (1) Dobbins was responsible for the murder and (2) Geary's theory of the case was too antagonistic to Dobbins for Dobbins to receive a fair trial if the cases were joined for trial. Court's Opinion ¶ 4. Specifically, in opposing joinder, Dobbins stated,

> At the bind-over hearing, Mr. Geary testified and presented a defense that Mr. Dobbins *was solely responsible* for the offense and forced Mr. Geary to be present at the offense. Mr. Geary presented a defense that he was too small and weak to have committed the offense and the older and bigger Mr. Dobbins committed the

38

offense. It is expected Mr. Geary would present the same defense if these cases were joined for trial . . . .

(Emphasis added.)

[¶64] In its review of the case file before the start of the trial, the trial court would have been reminded of Dobbins's statements opposing joinder and could properly consider those statements in exercising its discretion in ruling on relevant evidentiary issues at trial.

[¶65] During trial, Dobbins sought to introduce the docket entry indicating that Geary had pleaded guilty to the murder. Dobbins did not propose to offer the bind-over hearing transcript or Geary's plea colloquy with the trial court, which would have been a more complete statement of Geary's acceptance of responsibility for the murder and Geary's previously expressed view that—to quote Dobbins's counsel—Dobbins "was solely responsible" for the murder.

[¶66] In his opening statement to the jury, Dobbins's counsel asserted, "Samuel Geary is guilty of murder. Reggie Dobbins witnessed a murder. And that's why Reggie Dobbins is not guilty of murder." Dobbins's brief on appeal asserts that his "theory of defense was that his friend, Sam Geary, murdered [the victim] while Dobbins stood by in shock." Dobbins's theory of defense and his arguments to the trial court in support of admitting the docket entry

suggested that Dobbins planned to use the docket entry evidence of Geary's plea to argue that Geary's conviction exonerated Dobbins, or that Geary was solely responsible for the murder, or at least that the plea created a reasonable doubt as to Dobbins's guilt.

[¶67] With Dobbins's in-the-record statements opposing the motion for joinder, the trial court was properly concerned that admission of the docket entry alone, for the purposes to be asserted by the defense, could mislead the jury as to the meaning and significance of Geary's plea. Dobbins could not and should not have been permitted to assert one view of Geary's statements regarding Dobbins's responsibility for the murder in opposing joinder—that Dobbins "was solely responsible" for the murder—and a completely opposite view of Geary's statements regarding Dobbins's responsibility for the murder at trial. If the docket entry reflecting Geary's plea had been introduced as an exception to the hearsay rule, some recognition for Geary's statements asserting that Dobbins "was solely responsible" for the murder would have been necessary to counter the misleading suggestion that Dobbins was seemingly prepared to make to the jury that Geary's plea indicated Geary's sole responsibility for the murder.

[¶68]   The Court decides that the trial court abused its discretion in refusing Dobbins's effort to mislead the jury and should have allowed evidence of Geary's plea without evidence of Geary's actual statements about Dobbins's responsibility for the murder.   Contrary to the Court's decision, I would hold that the trial court acted within its broad discretion pursuant to M.R. Evid. 403 to exclude the docket entry after determining that its probative value—without additional evidence to provide the proper context—was substantially outweighed by its potential to mislead the jury.  *See State v. Filler*, 2010 ME 90, ¶ 17, 3 A.3d 365 (reiterating that "[c]ourts are afforded wide discretion to make Rule 403 determinations").

[¶69]   Geary's guilty plea, as the Court acknowledges, had little probative value because it was not necessarily inconsistent with Dobbins's guilt and there was plenty of other evidence admitted that established Geary's involvement in the murder.  Court's Opinion ¶¶ 31, 46-50.  On the other hand, the trial court correctly concluded that admitting the docket entry indicating Geary's guilty plea "in a vacuum" would have invited the jury to speculate whether Geary pleaded guilty as a principal or an accomplice and allowed Dobbins to distort the jury's role as fact-finder by suggesting that Geary's plea indicated that Geary accepted sole responsibility for the murder.

[¶70] Furthermore, had the court admitted Geary's plea in evidence, the State's ability to provide context by introducing inculpatory statements made by Geary about Dobbins would have been limited by the Confrontation Clause, *see* U.S. Const. amend. VI, which prohibits the admission of statements by a nontestifying codefendant to implicate a defendant in a crime. *See Bruton v. United States*, 391 U.S. 123, 135-36 (1968). Thus, in addition to its potential to mislead the jury, the admission of Geary's plea would have been unfairly prejudicial to the State; this lends further support to the trial court's decision to exclude the plea pursuant to Rule 403.

[¶71] Because the trial court properly weighed and considered these factors in accordance with Rule 403, it did not exceed the bounds of its discretion, *see State v. Lipham*, 2006 ME 137, ¶ 9, 910 A.2d 388, when it rejected Dobbins's efforts to mislead the jury by introducing Geary's guilty plea without the context necessary for the jury to consider accurately its meaning and significance.

42

Tina Heather Nadeau, Esq. (orally), The Law Office of Tina Heather Nadeau, PLLC, Portland, and Rory A. McNamara, Esq., Drake Law, LLC, Berwick, for appellant Reginald J. Dobbins Jr.

Janet T. Mills, Attorney General, and John Alsop, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Superior Court docket number CR-2015-35
FOR CLERK REFERENCE ONLY